UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ATIKUL KHAN,

Plaintiff,

– *against* –

RENAISSANCE NEW YORK TIMES SQUARE HOTEL, *and* HOTEL AND GAMING TRADES COUNCIL,

Defendants.

**OPINION & ORDER**

25-cv-04124 (ER)

RAMOS, D.J.:

Atikul Khan brings this action against Renaissance New York Times Square Hotel (the "Hotel" or "Renaissance") and the Hotel and Gaming Trades Council, AFL-CIO (the "Union"), arising out of his termination from his employment at the Hotel. Doc. 1-1. Specifically, Khan seeks vacatur of the arbitration award upholding his termination, pursuant to Section 301 of the Labor Management Relations Act (the "LMRA"). He further asserts claims of retaliation and discrimination against Renaissance, and alleges that the Union breached its duty of fair representation by declining to challenge the arbitration award on his behalf. Pending before the Court are Defendants' motions to dismiss the complaint in its entirety. Docs. 21 and 24. For the reasons stated below, the motions are GRANTED.

## I. BACKGROUND

### A. Factual Background

The following facts are based on the allegations in the complaint, which the Court accepts as true for purposes of the instant motion. *See, e.g.*, *Koch v. Christie's International PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The Court also considers the collective bargaining agreement, known as the Industry-Wide Agreement (the "IWA"), *see* Doc. 22-1; Doc. 25-1, governing the employment relationship between Renaissance

and its Union employees, which is integral to the complaint. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010).

Renaissance is a hotel located in New York City. *See* Doc. 1-1 ¶ 10. Khan was employed by Renaissance as a bartender from 1996 until his termination on December 7, 2024. *Id.* ¶ 8. During that time, he also served as a union delegate for Local 6 of the Union. *Id.* ¶¶ 1, 8. The complaint describes Khan as an employee who "has received positive evaluations during his career, and various recognitions and awards, and had no prior disciplinary history" prior to the incident giving rise to his termination. *Id.* ¶ 9. Khan is Bangladeshi. *Id.* ¶¶ 39, 41.

Renaissance and the Union are signatories to the IWA. *See* Doc. 22 ¶ 3; Doc. 25 ¶ 3.

IWA Article 26(A) provides in relevant part:

> All complaints, disputes or grievances arising between the parties hereto involving questions or interpretation or application of any clause of this Agreement, or any acts, conduct or relations between the parties, directly or indirectly, which shall not have been adjusted by and between the parties involved shall be referred to a permanent umpire(s) to be known as the Impartial Chairperson, and his/her decision shall be *final and binding* upon the parties hereto.

Doc. 25-1 at 10 (emphasis added).

IWA Article 27(A) provides:

> The EMPLOYER shall have the right to discharge or discipline any employee. The UNION may question whether an employee's discharge or discipline was for just cause.

Doc. 25-1 at 11.

The complaint alleges that, in October 2023, the Hotel was acquired by "HEI Hotel and Resorts."[1] Doc. 1-1 ¶ 11. At that time, issues began arising concerning employee benefits, health insurance, sick leave, and vacation days. *Id.*

---

[1] Renaissance disputes this characterization and represents that "HEI Hotels Inc." is a property management company that Renaissance utilizes to staff the Hotel and that employs the workers in question. Doc. 23 at 8.

Approximately one year later, in October 2024, Khan and other union members went to the office of Diana Torres, Renaissance's Human Resources manager, to request a meeting to discuss these ongoing issues. *Id.* ¶ 12. Torres allegedly responded by screaming at the employees and threatening to call security, and then left her office. *Id.*

On November 23, 2024, Khan submitted a memorandum on behalf of the Hotel's union membership to Torres and other Hotel management requesting that union members "receive all entitled vacation/personal[/]sick days." *Id.* ¶ 13. Three days later, on November 26, 2024, Khan and several other employees again approached Torres in her office "to continue to raise concerns about obtaining health benefits and other vacation and leave benefits." *Id.* ¶ 15. Torres videotaped a portion of this interaction on her cell phone. *Id.* ¶ 16.

As a result of this interaction, approximately two weeks later, on December 7, 2024, Khan was served with a notice of termination. *Id.* ¶ 17.

*1. The Arbitration Proceedings*

Khan grieved his termination through the Union, and after mediation proved unsuccessful, an expedited arbitration was held on December 18 and 19, 2024. *Id.* ¶ 18. Khan was represented by a union attorney at the arbitration. *See id.* ¶ 6. At the hearing, Renaissance called a single witness—Torres—while Khan called three witnesses—himself, and two other Renaissance employees. *Id.* ¶ 19. The complaint alleges that four additional witnesses were prepared to testify on Khan's behalf but were not permitted to do so because Renaissance's attorney "insisted he had to leave early to pick up his children that day." *Id.*

Following the hearing, the arbitrator, Impartial Chairperson Philip J. Kellett ("IC Kellett"), issued a decision on January 6, 2025, (the "Arbitration Decision") upholding the terminations of both Khan and a second bartender alleged to have participated in the incident, Mohammed Wadud, who is also Bangladeshi. *Id.* at 13–17.

IC Kellett noted that "[b]ecause [Khan and Wadud's] current [e]mployer has only managed th[e] property for the last couple of years, [he] draws no inferences from the absence in the record of evidence of any prior misconduct on [Khan and Wadud's] part." *Id.* at 13.

In his written decision, IC Kellett described his observations of the video taken by Torres of the November 26, 2024, incident, finding, *inter alia*, that "[t]he video clearly shows [Khan and Wadud] arrayed like a human barrier across the threshold of the doorway to (and only exit from) Ms. Torres's office;" that Torres "made several attempts to leave her office but was physically prevented from doing so;" that even after Torres stated "that she had to use the restroom and tried to exit the room . . . [Khan and Wadud] would not let her pass;" and that when "Torres attempted to exit the office, [Khan and Wadud] appear to physically block her from doing so." *Id.* at 14–15.

IC Kellett further acknowledged that "[u]nion representatives may, in the course of representing their fellow employees, act tough, make accusations, speak loudly and aggressively – even curse – while making their points." *Id.* at 15. He held however, that "what [Khan and Wadud] actually did here – physically blocking and preventing Ms. Torres from leaving her office (even to go to the bathroom) – went beyond any definition of assertive protected advocacy." *Id.* at 16.

IC Kellett stated that he did not weigh Khan's and Wadud's years of unblemished work history as a mitigating factor, and concluded:

> [E]ven if both [Khan and Wadud] had an unblemished disciplinary record with their prior employer at the property … and even given their long term service, these factors in mitigation are immaterial in cases of theft, vandalism or threatening or menacing behavior among other forms of egregious misconduct. Thus, while a union representative may engage in a heated exchange with a management official, such license is accompanied by the concomitant right of the manager to declare a meeting 'over'. And while a long-term employee may point to that fact to mitigate a disciplinary penalty, where, as here, [Khan and Wadud] ignored Ms. Torres's demand that they leave her office and where, as here, [Khan and Wadud]

> physically prevented Ms. Torres from exiting her own office, they have crossed a line, and the consideration normally accorded to forceful advocacy and mitigation dissolves. What [Khan and Wadud] did here was, in effect, to trap Ms. Torres in her office and accord her no right to retreat from a confrontation that they engineered. They picked the time, the location, and the duration of the confrontation and behaved in an increasingly menacing and threatening manner as the confrontation progressed. They did so even after Ms. Torres asked them to leave and after she herself tried to leave her own office but was prevented from doing so by [Khan and Wadud]. Under these circumstances, the Chairperson concludes that Ms. Torres's sense of apprehension for her physical safety was a reasonable reaction to [Khan and Wadud's] conduct.

*Id.* at 16–17.

On February 21, 2025, the Union attorney representing Khan moved for reconsideration of IC Kellett's decision upholding Khan's termination. *Id.* ¶ 26. By an order dated April 17, 2025, after the filing of the instant complaint, IC Kellett denied Khan's request for a reconsideration of the arbitration decision. *See* Doc. 22-5.

Khan then requested that the Union attorney representing him file an Article 75 proceeding to vacate the arbitration decision, but the Union's attorney declined to do so. Doc. 1-1 ¶ 27. Further, the complaint alleges that Khan and other Bangladeshi employees received harsher discipline as a result of the November 26, 2024, incident than a similarly situated Hispanic employee, Antonio Guevara. *Id.* ¶¶ 39, 41.

*2. The Consent Award*

Approximately two months after Khan's termination, on March 13, 2025, IC Kellett issued a separate, unrelated consent award incorporating the terms of a settlement between Renaissance and the Union. *Id.* at 31–32. According to the complaint, the consent award addressed many of the same employee benefits issues that Khan, and other union members, had raised with Torres in October and November 2024. *See id.* ¶ 14.

**B. Procedural Background**

Khan initially filed this action on April 5, 2025, in New York State Supreme Court, Index No. 652187/2025. *See* Doc. 1-1. The complaint seeks vacatur of the

arbitration award upholding Khan's termination, pursuant to N.Y. C.P.L.R. § 7511(b), contending that the decision was "irrational, arbitrary and capricious, excessive, and shocking to the conscience." *Id.* ¶¶ 29, 33. Specifically, the complaint alleges that IC Kellett: (1) misinterpreted the events in question; (2) "overlooked significant evidence that Torres was not at all prevented from leaving her office;" and (3) "wrongfully discounted [Khan's] unblemished years of service." *Id.* ¶¶ 24, 25, 26. The complaint asserts three causes of action against Renaissance: (1) retaliation in violation of Section 215 of the New York State Labor Law ("NYLL"); (2) discrimination on the basis of national origin in violation of New York State Human Rights Law ("NYSHRL"); and (3) discrimination on the basis of national origin in violation of the New York City Human Rights Law ("NYCHRL"). *Id.* ¶¶ 37, 39, 41.[2] The complaint asserts a single cause of action against the Union: breach of the duty of fair representation, based on the Union's refusal to file an Article 75 proceeding challenging the arbitration award. *Id.* ¶ 43.

Renaissance removed the case to this Court on May 16, 2025, based on federal question jurisdiction[3] pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Doc. 1.

On September 5, 2025, Renaissance filed its motion to dismiss the complaint, as against it, in its entirety, with prejudice. Doc. 21. Specifically, Renaissance argues that Khan's first cause of action, seeking to vacate the arbitration decision, should be dismissed because the complaint "does not set forth any facts to meet the strict standard

---

[2] The complaint styles the NYSHRL and NYCHRL claims as both a disparate treatment claim, *see* Doc. 1-1 ¶ 2, and a retaliation claim, *see id.* ¶¶ 39, 41. Renaissance, in its brief, contends that Khan's NYSHRL and NYCHRL claims "were improperly brought as retaliation, rather than discrimination claims." Doc. 23 at 22 n.8. Moreover, Khan, in his opposition brief, likewise analyzes these claims as discrimination, rather than retaliation claims. *See* Doc. 30 at 17–19. Accordingly, the Court construes the NYSHRL and NYCHRL claims as discrimination claims, consistent with its substantive allegations.

[3] Khan commenced this action pursuant to Section 301 of the LMRA. Doc. 1-1 ¶ 1. LMRA § 301 "provides jurisdiction over '[s]uits for violation of contracts between an employer and a labor organization,' 29 U.S.C. § 185(a), and it is well established that this provision authorizes courts to enforce or vacate labor arbitration awards." *Trustees of New York State Nurses Association Pension Plan v. White Oak Global Advisors, LLC*, 102 F.4th 572, 601–02 (2d Cir. 2024) (citing *Textile Workers Union of America v. Lincoln Mills of Alabama*, 353 U.S. 448, 450–51 (1957)).

to vacate;" that the retaliation claim should be dismissed because the complaint "fails to plausibly allege participation in a protected activity or that a causal connection exists between [Khan's] alleged protected activity and his termination;" and that the discrimination claims should be dismissed because the complaint "fails to plead any plausible, non-conclusory allegations suggesting that [Khan] was treated less favorably because of his national origin." Doc. 23 at 7, 8.

Also on September 5, 2025, the Union filed its motion to dismiss the complaint, as against it, in its entirety. Doc. 24. Specifically, the Union argues that the complaint fails to allege how its decision not to appeal the Arbitration Decision "was wrongful as a matter of law or fact;" that it was not contractually required to attempt to appeal an adverse arbitration award; that "even if [it] had a duty to consider an extra-contractual appeal," the complaint "pleads no facts showing that [it] exercised its broad discretion in an arbitrary, discriminatory, or bad faith manner;" and that the complaint "does not plead how any Union appeal to this or any other [c]ourt might plausibly vacate" the arbitration decision. Doc. 26 at 5.

On October 10, 2025, Khan filed a brief in opposition. Doc. 30. On October 24, 2025, Renaissance and the Union filed replies in further support of their motions. Docs. 33 and 34.

## II. LEGAL STANDARD

### A. Rule 12(b)(6)

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the amended complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Koch*, 699 F.3d at 145. However, the Court is not required to credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief

that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

The question in a Rule 12(b)(6) motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) 'is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits,'" and without regard for the weight of the evidence that might be offered in support of the plaintiff's claims. *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (quoting *Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)). Furthermore, "only a complaint that states a plausible claim for relief survives a motion to dismiss" and "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

**B. External Documents**

In resolving a motion to dismiss under Rule 12(b)(6), courts generally may not consider materials extrinsic to the complaint. Fed. R. Civ. P. 12(d). However, that rule is not absolute. Although the court is generally "confined to the allegations contained within the four corners of [the] complaint" in deciding a Rule 12(b)(6) motion, the court "may also consider any documents attached to the complaint as an exhibit or incorporated

in it by reference," *Carlin v. Davidson Fink LLP*, 852 F.3d 207, 212 (2d Cir. 2017) (internal quotations omitted), "matters of which judicial notice may be taken under Fed.R.Evid. 201," *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991), or documents the plaintiff relied on in drafting the complaint, *Chambers v. Time Warner*, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

The Court "need not accept as true any allegations that are contradicted by documents deemed to be part of the [amended] complaint, or materials amenable to judicial notice." *In re MBIA, Inc., Securities Litigation*, 700 F. Supp. 2d 566, 576 (S.D.N.Y. 2010).

## III. DISCUSSION

### A. Judicial Notice of External Documents

Renaissance attaches five documents to the Declaration of Nicola Ciliotta in support of its motion to dismiss, Doc. 22:

- Portions of the IWA between the Hotel Association of New York City, Inc. and the Union;
- The arbitration decision of IC Kellett, dated January 6, 2025;
- Khan's request for reconsideration of the arbitration decision, dated February 21, 2025;
- Renaissance's response to Khan's request for reconsideration of the arbitration decision, dated March 7, 2025; and
- IC Kellett's order denying Khan's request for reconsideration of the arbitration decision, dated April 17, 2025.

The Union attaches one document to the Declaration of Barry N. Saltzman in support of its motion to dismiss, Doc. 25:

- Portions of the IWA.

Khan includes additional factual allegations not contained in the complaint and further attaches one document to his declaration in opposition to Defendants' motions to dismiss, Doc. 29:

- An email sent from Khan to his union attorney, Joseph Farelli, dated December 16, 2024.

The Union submitted a USB drive containing a video recording of part of the November 26, 2024, incident with the Declaration of Joseph F. Farelli in its reply in further support of its motion to dismiss. Doc. 33-1.

Here, the arbitration decision of IC Kellett, Doc. 1-1 at 13–17, and Khan's request for reconsideration of the arbitration decision, *id.* at 33–38, are both attached to the complaint. Accordingly, the Court considers these documents in evaluating the motion to dismiss.

As to the documents not attached to or incorporated by reference in the complaint, a document deemed "integral" to the complaint is "a fair object of consideration on a motion to dismiss." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). A document is integral to the complaint "where the complaint relies heavily upon its terms and effect." *Chambers*, 282 F.3d at 153 (internal quotations omitted). Here, although the complaint does not expressly mention the IWA, Khan's claims—particularly his claim seeking vacatur of the arbitration award and his claim alleging that the Union breached its duty of fair representation by declining to pursue vacatur of the arbitration award—necessarily depend on the terms of the collective bargaining agreement governing the parties' arbitration and grievance procedures. The IWA is therefore properly considered integral to the complaint, notwithstanding the absence of an express mention of it. *See Global Network Communications*, 458 F.3d at 157 (stating that a document is generally considered integral to the complaint where it is a "contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls"); *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir. 1991) (noting that, in deciding a motion to dismiss, a court may consider a document which the "plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint"); *c.f. Cox v. Perfect Building Maintenance Corp.*, No. 16 Civ. 7474 (VEC), 2017 WL 3049547, at *3 (S.D.N.Y. July 18, 2017) (noting that "courts have regularly taken judicial notice of arbitration awards

and collective bargaining agreements in considering a motion to dismiss"). Khan also does not raise an objection to the Court's consideration of the IWA.

Additionally, the video recording of the November 26, 2024, incident is properly considered integral to the complaint. Khan alleges that "the video recording demonstrates that [IC Kellett's] interpretation of the events is not consistent with what actually happened in the recording," and that allegation is central to his claim that IC Kellett's decision should be vacated. Doc. 1-1 ¶ 24. Thus, the video recording is properly considered integral to the complaint. *See Palm v. Brooks*, No. 22 Civ. 9729 (VB), 2024 WL 1908388, at *2 (S.D.N.Y. May 1, 2024) (explaining that courts may consider video footage in deciding a motion to dismiss where "the footage is referenced in the complaint and '[k]ey allegations in the complaint rest[] on the . . . video'"); *Ashley v. Gonzalez*, No. 19 Civ. 6282 (AJN), 2020 WL 7027501, at *2 (S.D.N.Y. Nov. 30, 2020) (noting "that extraneous videos documenting the events in question are not properly considered on a motion to dismiss unless the plaintiff relied upon the videos when drafting the complaint"). Khan also does not raise an objection to the Court's consideration of the video recording.

Renaissance's response to Khan's request for reconsideration, Doc. 22-4, by contrast, is not integral to the complaint, as the complaint neither mentions that document nor relies upon its terms or effect. The Court therefore does not consider it.

Further, in considering a motion to dismiss, "courts have regularly taken judicial notice of arbitration awards." *Brown v. New York City Transit Authority*, No. 22 Civ. 02949 (ALC), 2024 WL 1347283, at *5 (S.D.N.Y. Mar. 29, 2024) (citing Fed. R. Evid. 201(b)). However, "[w]hile the Court is permitted to take judicial notice of the existence of [an] [a]rbitration [d]ecision on a motion to dismiss, it cannot do so to establish the truth of the facts asserted therein." *Beaton v. Metropolitan Transportation Authority New York City Transit*, No. 15 Civ. 8056 (ER), 2016 WL 3387301, at *4 (S.D.N.Y. June 15, 2016). Accordingly, while the Court takes judicial notice of IC Kellett's order denying

reconsideration, Doc. 22-5, it does not consider the truth of any factual findings contained therein.[4] Khan also does not raise an objection to the Court's consideration of IC Kellett's order denying reconsideration.

The Court declines to consider the email and additional averments Khan includes in his declaration. Doc. 29; Doc. 29-1. It is well established that "[a] plaintiff cannot effectively amend his complaint by means of allegations and materials contained in papers generated in response to a motion to dismiss." *Lam v. American Express Co.*, 265 F. Supp. 2d 225, 234 n.1 (S.D.N.Y. 2003) (citing Fed. R. Civ. P. 12(b)). Accordingly, Khan's additional factual assertions and accompanying exhibits are inadmissible.

**B. Vacatur of the Arbitration Award**

*1. Legal Standard*

Although Khan invokes Article 75 of the New York Civil Practice Law and Rules ("CPLR") as the governing vacatur standard, *see* Doc. 1-1 ¶¶ 29–30, Renaissance argues that the Federal Arbitration Act ("FAA") provides the proper standard because the action was removed to this Court on the basis of federal question jurisdiction, *see* Doc. 23 at 14. Because the petition to vacate fails under either standard, the Court need not determine which standard applies.

In any event, "[t]here is little practical difference between the standards applied by the CPLR and the FAA to the question of whether an arbitral award should be vacated."[5] *Flintlock Construction Services, LLC v. Arch Specialty Insurance Company*, No. 23 Civ. 1701 (LGS), 2024 WL 863700, at *3 (S.D.N.Y. Feb. 29, 2024); *see also Magid v. Waldman*, No. 19 Civ. 11516 (JMF), 2020 WL 4891218, at *3 (S.D.N.Y. Aug. 19, 2020). "Under either standard, judicial review of arbitration awards is deferential,

---

[4] The order is, in any event, not integral to the complaint, as it was rendered after the filing of the complaint.

[5] Indeed, the Supreme Court has recognized that "[t]he text of the FAA was based upon that of New York's arbitration statute." *Hall Street Associates, LLC v. Mattel, Inc.*, 552 U.S. 576, 589 n.7 (2008).

limited and narrowly circumscribed." *Flintlock*, 2024 WL 863700, at *3 (collecting cases).

Under the CPLR, a court may vacate an arbitration award if the rights of the party moving to vacate were prejudiced by:

> (1) corruption, fraud or misconduct in procuring the award; or
>
> (2) partiality of an arbitrator appointed as neutral, except where the award was by confession; or
>
> (3) an arbitrator, or agency or person making the award exceeded his power or so imperfectly executed it that a final and definite award upon the subject matter submitted was not made; or
>
> (4) failure to follow the procedure of this article, unless the party applying to vacate the award continued with the arbitration with notice of the defect and without objection.

CPLR § 7511(b)(1).

Under the FAA, a court may vacate an arbitration award:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

As a "judicial gloss" on the statutory grounds for vacatur under the FAA, the Second Circuit has held that "the court may set aside an arbitration award if it was rendered in 'manifest disregard of the law.'" *Schwartz v. Merrill Lynch & Co.*, 665 F.3d 444, 451 (2d Cir. 2011) (quoting *T.Co. Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 340 (2d Cir. 2010)). It is well-settled that the manifest disregard doctrine "is a

doctrine of last resort—its use is limited only to those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent." *Duferco International Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389 (2d Cir. 2003). "To succeed in challenging an award under the manifest disregard standard, a party must make a showing that the arbitrators knew of the relevant legal principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it." *Seneca Nation of Indians v. New York*, 988 F.3d 618, 626 (2d Cir. 2021) (internal quotations omitted).

"A court's review of an arbitration award is . . . severely limited so as not to frustrate the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Scandinavian Reinsurance Co. Ltd. v. Saint Paul Fire and Marine Insurance Co.*, 668 F.3d 60, 71–72 (2d Cir. 2012) (internal quotations and citations omitted). An award "should be enforced, despite a court's disagreement with it on the merits," so long as "there is a barely colorable justification for the outcome reached." *Banco de Seguros del Estado v. Mutual Marine Office, Inc.*, 344 F.3d 255, 260 (2d Cir. 2003) (internal quotations omitted). "Given the deference afforded arbitration decisions," vacatur under the manifest disregard doctrine "requires more than a mistake of law or a clear error in fact finding." *Goldman v. Architectural Iron Co.*, 306 F.3d 1214, 1216 (2d Cir. 2002); *see also Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*, 559 U.S. 662, 671 (2010) (explaining that "[i]t is not enough" for the party seeking vacatur "to show that the arbitrator committed an error—or even a serious error"). Indeed, the party seeking vacatur "must clear a high hurdle." *Stolt-Nielsen S.A.*, 559 U.S. at 671.

*2. Analysis*

Renaissance argues that Khan's "vacatur request amounts to little more than a collection of repackaged arguments that have already been considered and litigated by [IC Kellett] in the underlying arbitration." Doc. 23 at 21.

Khan argues that vacatur based on the manifest disregard doctrine is warranted, "[g]iven the fact that the" National Labor Relations Act (the "NLRA") and the LMRA were "so obviously implicated in the underlying arbitration, as well as [IC Kellett's] blatant disregard to apply th[ose] . . . protections or evaluate its implications to the" underlying arbitration. Doc. 30 at 14. As such, he argues that "the application of the doctrine of manifest disregard" is "particularly appropriate in this case." *Id.*

*a. The Facts*

Under either the CPLR or FAA standards, there is no basis to vacate the arbitration award. Khan does not allege, in his complaint or in his opposition, that IC Kellett's decision was procured by corruption, fraud, or undue means; that IC Kellett was partial or corrupt; that IC Kellett engaged in misconduct or misbehavior prejudicing his rights, or that IC Kellett exceeded his powers or so imperfectly executed them such that a mutual, final, and definite award was not made. Instead, the complaint alleges that IC Kellett's decision was "irrational, arbitrary and capricious, excessive, and shocking to the conscience," and should be vacated on that basis. Doc. 1-1 ¶ 33.

Khan alleges that "the video recording demonstrates that [IC Kellett's] interpretation of the events is not consistent with what actually happened in the recording" and that IC Kellett "overlooked significant evidence that Torres was not at all prevented from leaving her office." *Id.* ¶¶ 24–25. But the record makes clear that IC Kellett did in fact consider the video. IC Kellett specifically found that the video "clearly shows [Khan and Wadud] arrayed like a human barrier across the threshold of the doorway to (and only exit from) Ms. Torres's office;" that the video "reveals that [Torres] made several attempts to leave her office but was physically prevented from doing so;" and that "[o]n the video, when Ms. Torres attempted to exit the office, [Khan and Wadud] appear to physically block her from doing so." *Id.* at 14–15. Moreover, after review of the video, this Court finds that IC Kellett's analysis does in no way evince a clear error in fact-finding.

Khan next alleges that IC Kellett "disregarded [his] long and blemish[-]free work history." *Id.* ¶ 21. As an initial matter, IC Kellett stated that he did not draw any inferences from the absence of any record of prior misconduct because the current employer had only managed the property for the last few years. *Id.* at 13. That notwithstanding, IC Kellett further addressed this issue, explaining that even if Khan had a blemish-free disciplinary record, such was "immaterial in cases of . . . threatening or menacing behavior among other forms of egregious misconduct." *Id.* at 16. Far from disregarding Khan's work history, IC Kellett considered and expressly rejected it as a mitigating factor, for reasons stated in the decision itself.

Khan further alleges that "the penalty of termination is grossly disproportionate to the substantiated conduct" and that it "shocks all sense of reason and fairness." *Id.* ¶ 35. As discussed above, however, IC Kellett found that Khan and Wadud "in effect . . . trap[ped] Ms. Torres in her office and accord[ed] her no right to retreat from a confrontation that they engineered," and concluded that "Torres's sense of apprehension for her physical safety was a reasonable reaction to [Khan and Wadud's] conduct." *Id.* at 16–17. IC Kellett accordingly determined that Renaissance "ha[d] just cause to discharge [Khan] from employment." *Id.*

In his opposition, Khan argues that IC Kellett failed to mention that he "was permitted to continue working for nearly ten (10) days following the November 26, 2024, interaction, without enduring even so much as a suspension from work." Doc. 30 at 15. That Khan was not fired immediately is inconsequential. Khan was not terminated because he was an ongoing threat; he was terminated because of his conduct during the November 26, 2024, incident. *See* Doc. 1-1 at 14–17. Further, Khan's suggestion that he is entitled to credit for refraining from additional misconduct during that interim is unpersuasive.

Khan also argues that, "perhaps coincidentally," approximately two months after his termination, IC Kellett "incorporated terms of a settlement between [Renaissance] and

the Union into a [c]onsent [a]ward that . . . remedied precisely those issues" that he attempted to raise with Torres during the November 26, 2024, incident. Doc. 30 at 16. But IC Kellett's decision makes clear that Khan was not terminated for the substance of what he was advocating for, but for the manner in which he did so. *See* Doc. 1-1 at 14–17. IC Kellett expressly found that Khan's actions "went beyond any definition of assertive protected advocacy." *Id.* at 16. That the underlying benefits dispute may have later been resolved through a separate, unrelated consent award does not undermine IC Kellett's independent finding regarding Khan's conduct during the November 26, 2024, incident.

*b. The Law*

Khan argues that IC Kellett "failed to consider Section 8(a)(1) of the NLRA and its prohibition against employer restraint or interference." Doc. 30 at 14. He also argues that "completely absent from [IC] Kellett's decision, is New York Labor Law § 215's prohibition on employer retaliation against employees . . . for complaints regarding wages, benefits, hours, and working conditions." *Id.* at 17.

Section 8(a)(1) of the NLRA, makes it is an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise" of their rights to organize, join unions, or engage in collective bargaining. 29 U.S.C. § 158(a)(1).

Section 215(1)(a) of the NYLL states that an employer shall not "discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee . . . because such employee has made a complaint . . . that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of [the NYLL]." N.Y. Labor Law § 215(a)(1).

Although IC Kellett's decision does not expressly mention § 8(a)(1) of the NLRA or § 215 of the NYLL, the decision could not have been more clear that he considered the substance of the protections those statutes provide. IC Kellett expressly recognized that "[u]nion representatives may, in the course of representing their fellow employees, act

tough, make accusations, speak loudly and aggressively – even curse – while making their points," and that "[t]hey may not be disciplined for doing any of these protected activities," and further noted that "nothing in this [a]ward should be read as standing for a contrary proposition." Doc. 1-1 at 15–16. Khan's contention that this analysis is "merely lip service," Doc. 30 at 14, is unpersuasive.

*c. Conclusion*

To the extent Khan simply disagrees with IC Kellett's interpretation of the record, that disagreement is immaterial. *Jiakeshu Technology Limited v. Amazon.com Services, LLC*, No. 22 Civ. 10119 (JGLC), 2024 WL 36999, at *5 (S.D.N.Y. Jan. 3, 2024) (stating "that [p]etitioner does not agree with the [a]rbitrator's assessment of the record . . . is not a basis to vacate an arbitration award"). Where, as here, parties have contracted to have their dispute settled by an arbitrator through a collective bargaining agreement, "it is the arbitrator's view of the facts . . . that they have agreed to accept." *United Paperworkers International Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 37–38 (1987). Nor is the Court in a position to second-guess IC Kellett's factual findings. *See Westerbeke Corp. v. Daihatsu Motor Co., Ltd.*, 304 F.3d 200, 214 (2d Cir. 2002) (stating that "[t]he arbitrator's factual findings . . . are not subject to judicial challenge, particularly on [the court's] limited review of whether the arbitrator manifestly disregarded the law"); *see also United Paperworkers International Union*, 484 U.S. at 38 (explaining that a reviewing court may not reject an arbitrator's findings of fact "simply because it disagrees with them").

At bottom, "where an arbitrator explains his conclusions 'in terms that offer even a barely colorable justification for the outcome reached, confirmation of the award cannot be prevented by litigants who merely argue, however persuasively, for a different result." *International Brotherhood of Electric Workers, Local 97 v. Niagara Mohawk Power Corp.*, 143 F.3d 704, 717 (2d Cir. 1998) (quoting *Saint Mary Home, Inc. v. Service Employees International Union, District 1199*, 116 F.3d 41, 44 (2d Cir. 1997)); *see also*

*D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) (stating that an "arbitrator's rationale for an award need not be explained, and the award should be confirmed if a ground for the arbitrator's decision can be inferred from the facts of the case") (internal quotations omitted). Accordingly, Khan's first cause of action, seeking vacatur of the arbitration award, is dismissed.

### C. Retaliation Claim

#### *1. Legal Standard*

Section 215(1)(a) of the NYLL states that an employer shall not "discharge, threaten, penalize, or in any other manner discriminate or retaliated against any employee . . . because such employee has made a complaint . . . that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of [the NYLL]." N.Y. Labor Law § 215(a)(1).

Retaliation claims brought under the NYLL are subject to the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[6] *See, e.g.*, *Benzinger v. Lukoil Pan Americas, LLC*, 447 F. Supp. 3d 99, 130 (S.D.N.Y. 2020). Under this framework, a plaintiff has the initial burden to "establish a *prima facie* case of retaliation;" if the plaintiff does so, "the burden shifts to the defendant to articulate a legitimate, non-[retaliatory] reason for the employment action;" if the defendant does so, the burden shifts back to the plaintiff to "produce sufficient evidence to support a rational finding that the legitimate, non-[retaliatory] reasons proffered by the defendant were false, and that more likely than not [retaliation] was the real reason for the employment action." *Mullins v. City of New York*, 626 F.3d 47, 53–54 (2d Cir. 2010) (internal quotations and citations omitted). At the motion to dismiss stage, only the first

[6] Retaliation claims brought under Fair Labor Standards Act ("FLSA") and NYLL are governed by the same standard. *See, e.g.*, *Santi v. Hot in Here, Inc.*, No. 18 Civ. 03028 (ER), 2019 WL 290145, at *4 (S.D.N.Y. Jan. 22, 2019).

step of this framework is at issue. *See Littlejohn v. City of New York*, 795 F.3d 297, 320 (2d Cir. 2015).

To make a make a *prima facie* case of retaliation under the NYLL, a plaintiff must show: (1) "participation in protected activity known to the defendant;" (2) "an employment action disadvantaging the plaintiff;" and (3) "a causal connection between the protected activity and the adverse employment action." *Mullins*, 626 F.3d at 53. "An employment action disadvantages an employee if it well might have dissuaded a reasonable worker from making or supporting [similar] charge[s]." *Id.* (internal quotations and citation omitted).

To show participation in a protected activity, "an employee need not state his complaints with lawyerly precision." *Cortese v. Skanska Koch, Inc.*, 544 F. Supp. 3d 456, 471 (S.D.N.Y. 2021). The complaint, however, "must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Greathouse v. JHS Security Inc.*, 784 F.3d 105, 116 (2d Cir. 2015) (quoting *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011)). And while an employee's complaint to his employer "need not cite a specific statute," the complaint "must be of a colorable violation of the statute." *Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 473 (S.D.N.Y. 2013) (internal quotations and citations omitted). A complaint may be lodged in writing or orally. *See Greathouse*, 784 F.3d at 115.

A showing of a causal connection in retaliation claims can be established either: (1) directly, "through evidence of retaliatory animus directed against a plaintiff by the defendant," *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir. 1991) (internal quotations and citations omitted); or (2) indirectly, "by showing that the protected activity was closely followed in time by the adverse action, *Manoharan v. Columbia University College of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988).

*2. Analysis*

Khan alleges that he "has been retaliated against . . . after advocating for health insurance and other leave benefits for himself and others by being terminated from his employment." Doc. 1-1 ¶ 37.

Khan does not allege that he complained to Renaissance, or Torres, regarding any specific NYLL violation, nor can his advocacy be interpreted as raising an NYLL-related grievance. Moreover, Khan does not identify, in the complaint or his opposition, any provision of the NYLL that Renaissance is alleged to have violated. To be clear, the complaint does not even clearly identify the specific communication for which Khan claims he was retaliated against or what he said or complained about at that time. To the extent the communication for which Khan's retaliation claim stems from can be inferred from the complaint generally, it appears to refer to the grievance Khan and his fellow union members raised with Torres on November 26, 2024, "about obtaining health benefits and other vacation and leave benefits," Doc. 1-1 ¶ 15. These grievances, however, appear to be focused on benefits guaranteed under the collective bargaining agreement, not the assertion of rights guaranteed under the New York Labor Law.

The allegations in the complaint do not give rise to a plausible claim of retaliation under the NYLL. *See Kassman*, 925 F. Supp. 2d at 472–73 (stating that to make a *prima facie* retaliation claim under the NYLL, a "[p]laintiff must show that they complained about a specific violation of the [NYLL]") (internal quotations and citation omitted). As such, the retaliation claim may be dismissed on this basis alone.

**D. Discrimination Claims**

*1. Legal Standard*

An amendment made in 2019 by New York State lawmakers instructed that NYSHRL is to "be construed liberally . . . regardless of whether federal civil rights laws . . . have been so construed." N.Y. Exec. Law § 300. Similarly, city lawmakers have instructed that NYCHRL "be construed liberally . . . regardless of whether federal or New

York state civil human rights laws . . . have been so construed." N.Y.C. Admin. Code § 8-130(a). It has yet to be definitively resolved whether this amendment renders the NYSHRL's standard identical to, or merely closer to, that of the NYCHRL. *See Qorrolli v. Metropolitan Dental Associates*, 124 F.4th 115, 122–23 (2d Cir. 2024) (explaining that the NYSHRL "was amended in 2019 to align with the NYCHRL's more liberal pleading standard"). Courts in this District have routinely analyzed disparate treatment claims brought under the NYSHRL and NYCHRL together.[7] *See e.g.*, *Mumin v. City of New York*, 760 F. Supp. 3d 28, 52–53 (S.D.N.Y. 2024).

Discrimination claims brought under the NYSHRL and NYCHRL are also subject to the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Mitchell v. New York City Department of Education*, No. 20 Civ. 1555 (PGG), 2022 WL 621956, at *5 (S.D.N.Y. Mar. 3, 2022). "At the motion-to-dismiss stage, only the first step of this framework—the plaintiff's burden to allege a *prima facie* case of discrimination—is at issue." *Sabic-El-Rayess v. Teachers College, Columbia University*, 758 F. Supp. 3d 268, 276 (S.D.N.Y. 2024).

To state a claim for discrimination under either the NYSHRL and NYCHRL, a plaintiff "need only show differential treatment—that []he is treated 'less well'—because of a discriminatory intent." *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 110 (2d Cir. 2013). Importantly, these statutes are not "general civility code[s]," and "[t]he plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive." *Id.*

To survive dismissal, a plaintiff "must allege facts that would permit an inference that []he has been treated less well" as a result of being part of a statutorily protected category. *Mumin*, 760 F. Supp. 3d at 55. A plaintiff can make this showing by, among

[7] The Second Circuit Court of Appeals, in a summary order, has also considered discrimination claims brought under NYCHRL and NYSHRL together. *See Valerio v. Metropolitan Transportation Authority*, No. 24-1614, 2025 WL 686028, at *3 (2d Cir. Mar. 4, 2025) (summary order).

other things, "demonstrating the disparate treatment of at least one similarly situated employee outside [his] protected group and sufficient facts from which it may reasonably be inferred that the plaintiff's and comparator's circumstances . . . bear a reasonably close resemblance." *Id.* (internal quotations and citation omitted).

*2. Analysis*

Khan alleges, in merely conclusory fashion, that he has been discriminated against based on his Bangladeshi national origin. He asserts only the general, conclusory allegation that "he and other Bangladeshi employees received harsher penalties than a similarly situated Hispanic employee[,] Antonio Guevara." Doc. 1-1 ¶¶ 39, 41.

Renaissance responds that these allegations are "woefully insufficient as a matter of law." Doc. 23 at 28. The Court agrees.

The pleading standard for discrimination claims brought under the NYSHRL or NYCHRL is not an onerous one. But "[e]ven under th[is] relatively lenient standard . . . [a plaintiff's] claims must be more than conclusory or speculative to survive a motion to dismiss." *Bell v. McRoberts Protective Agency, Inc.*, No. 15 Civ. 0963 (JPO), 2016 WL 7192083, at *5 (S.D.N.Y. Dec. 12, 2016). Khan's allegations do not clear even this low bar. Fatally, the complaint says nothing further about the comparator, Guevara. Aside from merely concluding that Guevara is similarly situated, the complaint does not establish who Guevara is, what his position was, what conduct led to his discipline, or what penalty, if any, he received. Consequently, Khan has failed to adequately plead that he was treated less well because of his national origin. In substance, all Khan has pled is that he, who is Bangladeshi, was terminated, while another employee, who is Hispanic, was not. That Khan is Bangladeshi does not, without more, transform a routine termination into a claim for discrimination. Accordingly, Khan's discrimination claims under the NYSHRL and NYCHRL are dismissed.

**E. Duty of Fair Representation**

*1. Legal Standard*

A union "has a duty to represent fairly all employees subject to the collective bargaining agreement." *Spellacy v. Airline Pilots Association-International*, 156 F.3d 120, 126 (2d Cir. 1998) (citing *Air Line Pilots Association, International v. O'Neill*, 499 U.S. 65, 74 (1991)). This duty of fair representation "extends to both the negotiation of a collective bargaining agreement, and its enforcement and administration." *Id.* (internal citations omitted).

Courts in this District have characterized a plaintiff's obligation to plead sufficient conduct to support a claim for breach of the duty of fair representation as imposing an "enormous burden." *Dennis v. Local 804*, No. 07 Civ. 9754 (HB), 2009 WL 1473484, at *5 (S.D.N.Y. May 27, 2009). Indeed, "[a]ny substantive examination of a union's performance, therefore, must be highly deferential, recognizing the wide latitude that [unions] need for the effective performance of their bargaining responsibilities." *O'Neill*, 499 U.S. at 78.

To state a claim for breach of the duty of fair representation, a plaintiff must establish two elements. First, a plaintiff must show that the unions actions or inactions were "either arbitrary, discriminatory, or in bad faith." *Vaugh v. Air Line Pilots Association, International*, 604 F.3d 703, 709 (2d Cir. 2010) (internal quotations omitted) (quoting *O'Neill*, 499 U.S. at 67). Second, a plaintiff must demonstrate "a causal connection between the union's wrongful conduct and their injuries." *White v. White Rose Food, a Division of DiGiorgio Corp.*, 237 F.3d 174, 179 (2d Cir. 2001) (quoting *Spellacy*, 156 F.3d at 126).

A union's actions "are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be irrational." *O'Neill*, 499 U.S. at 67 (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953)). "This 'wide range of reasonableness' gives the

union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 45–46 (1998).

A union's actions "are discriminatory when 'substantial evidence' indicates that it engaged in discrimination that was 'intentional, severe, and unrelated to legitimate union objectives.'" *Vaughn*, 604 F.3d at 709 (quoting *Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America v. Lockridge*, 403 U.S. 274, 301 (1971)).

A union acts "in bad faith when it acts with an improper intent, purpose, or motive." *Spellacy*, 156 F.3d at 126. "Bad faith encompasses fraud, dishonesty, and other intentionally misleading conduct." *Id.*

*2. Analysis*

Khan alleges that the "Union has breached its duty of fair representation by refusing to file an Article 75 proceeding on his behalf challenging the arbitration decision." Doc. 1-1 ¶ 43.

The Union responds that "Khan fails to allege sufficient facts to plausibly fit the claimed breach into the Union's legal duty." Doc. 26 at 13. The Court agrees.

Courts in this District have consistently held that a union is under no obligation to appeal an adverse arbitration award. *See, e.g.*, *Naprstek v. Marriott International*, No. 21 Civ. 08560 (CM), 2024 WL 113804, at *10 (S.D.N.Y. Jan. 10, 2024); *Nieves v. District Council 37 (DC 37), AFSCME, AFL-CIO*, No. 04 Civ. 8181 (RJS), 2009 WL 4281454, at *10 (S.D.N.Y. Nov. 24, 2009) (collecting cases). A union also need not attempt to vacate an arbitration award in court. *See, e.g.*, *Crowell v. International Brotherhood of Teamsters, Local 202*, No. 00 Civ. 3480 (RCC), 2001 WL 1230531, at *4 (S.D.N.Y. Oct. 16, 2001) (stating that a union's duty of fair representation "does not obligate [it] to appeal or to file a petition to vacate an adverse award").

Moreover, "[c]ourts have consistently held that a presumption of finality must be accorded to arbitration decisions which are made pursuant to collective bargaining

agreements providing for 'final and binding grievance arbitration.'" *Ciano v. Utility Workers Union of America*, No. 94 Civ. 3423 (AGS), 1995 WL 489452, at *7 (S.D.N.Y. Aug. 15, 1995). Here, the collective bargaining agreement expressly provides that the arbitration decision "shall be *final and binding* upon the parties hereto." Doc 25-1 at 10 (emphasis added). "Having submitted the dispute to arbitration before an independent decisionmaker, the union was entitled, if not required, to abide by the award." *Crusco v. Fisher & Brother, Inc.*, 458 F. Supp. 413, 422 (S.D.N.Y. 1978). Finality of arbitration awards benefits both parties—having agreed to abide by the arbitrator's decision, each party reaps the corresponding benefits and burdens of that bargain, whatever the outcome of any particular arbitration.

Even assuming, *arguendo*, that a union may have a good-faith duty to consider whether to appeal or seek vacatur of an arbitration award, the complaint fails to plead any facts that the Union's decision was arbitrary, discriminatory, or made in bad faith. In fact, IC Kellett noted "the Union's vigorous advocacy on behalf of" Khan in the underlying arbitration. Doc. 1-1 at 16. Moreover, the Union actually submitted a request for reconsideration of IC Kellett's decision, which it contends "was within [it's] discretion and in no way required by the Union's duty of fair representation." Doc. 26 at 16 n.2.

Khan mentions in the complaint that an unrelated grievance hearing between the Hotel and the Union was scheduled for March 13, 2025, Doc. 1-1 ¶ 14, and attaches as an exhibit a copy of the resulting consent award rendered by IC Kellett, *id.* at 31–32. In his opposition, Khan argues that the Union's negotiation of this consent award—which secured for Renaissance employees the same benefits he had advocated for—is "indicative of the Union's arbitrary and bad-faith conduct," given that it followed his termination by approximately two months. Doc. 30 at 24–25. Specifically, Khan proffers two arguments in support. First, he argues that he was not merely seeking to challenge an arbitration decision which "he perceived as 'unfavorable,'" but one which "blatantly disregarded" both the basis of his termination and the fact that the very benefits he had

advocated for were later secured for other employees through the consent award—circumstances he argues should have prompted the Union to seek vacatur. *Id.* at 25. Second, he argues, "[a]lternatively, and far worse," that this suggests the plausible inference that Renaissance and the Union "had come to some, perhaps informal, preordained arrangement[]," under which the Union would allow Khan's termination to proceed in exchange for Renaissance's later stipulation to certain demands. *Id.* Khan contends, "[a]s if the timing . . . were not suspect enough," that IC Kellett's role in presiding over and rendering the consent award further supports an inference "that the Union had acted in bad faith with respect to [its] handling of [his] termination proceedings." *Id.* at 25–26.

However, these theories of collusion are merely conspiratorial and conclusory—and therefore insufficient. To survive a motion to dismiss, a plaintiff's claim "requires more than a charge that something bad happened and a conclusory allegation that this bad thing was also illegal because it resulted from a malevolent conspiracy." *Bejjani v. Manhattan Sheraton Corp.*, No. 12 Civ. 6618 (JPO), 2013 WL 3237845, at *15 (S.D.N.Y. June 27, 2013). Indeed, a plaintiff must "substantiate accusations of conspiracy with at least a few factual brushstrokes that bespeak plausibility." *Id.* at *13.

Khan's bare-bones allegations that the Union colluded with Renaissance do not support an inference of bad faith. Khan's collusion theory amounts to nothing more than the observation that two events involving the same parties occurred within a few months of each other. His effort to supply a post hoc explanation linking those two events cannot cure the absence of factual support for his collusion theory.

To the extent Khan, in his opposition, attempts to plead additional facts not contained in the complaint in an effort to bolster his arguments, the Court does not consider them. *See O'Brien v. National Property Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989) (stating that "it is axiomatic that [a] [c]omplaint cannot be amended by the briefs in opposition to a motion to dismiss").

Because Khan overlooks the weight of authority supporting the proposition that a union is under no obligation to appeal an arbitration award, and the fact that Khan does not plausibly allege any facts suggesting that the Union acted arbitrarily, discriminatorily, or in bad faith, his breach of the duty of fair representation claim is dismissed.

## IV. LEAVE TO AMEND

As a general rule, leave to amend should be freely given. *Jin v. Metropolitan Life Insurance Co.*, 310 F.3d 84, 101 (2d Cir. 2002); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires"). It is "within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). A court may deny leave to amend "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Holmes v. Grubman*, 568 F.3d 329, 334 (2d Cir. 2009).

Khan requests leave to amend the complaint to cure any deficiencies by pleading additional facts. Doc. 30 at 26. Both Renaissance and the Union oppose granting Khan leave to amend. Doc. 33 at 9 n.4; Doc. 34 at 13.

The Court grants Khan leave to amend in part.

As to Khan's retaliation and discrimination claims, the Court cannot conclude at this stage that amendment would be futile. Indeed, Khan's brief in opposition and his declaration reference numerous factual allegations not contained in the complaint, and therefore not appropriately considered in deciding the instant motion. Given that those claims were deficient due to a failure to plead sufficient factual allegations, granting leave to amend, with respect to those claims, is appropriate. *See Porat v. Lincoln Towers Community Association*, 464 F.3d 274, 276 (2d Cir. 2006) (stating that "[w]ithout doubt, this circuit strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6)"). That Khan requested leave to amend in the alternative and did not attach a proposed draft amended complaint is not a sufficient basis to deny leave to amend. *See Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities,*

*LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (noting that "[g]enerally, [a court] will not deem a request for leave to amend insufficient on the basis of form alone"); *see also Porat*, 464 F.3d at 276 (stating that "where a plaintiff clearly has expressed a desire to amend, a lack of a formal motion is not a sufficient ground for a district court to dismiss without leave to amend").

As to Khan's breach of the duty of fair representation claim against the Union, however, amendment would be futile. Because a union is under no obligation to appeal or attempt to vacate an adverse arbitration award, any attempt to replead by asserting additional factual allegations would be futile.

Amendment of Khan's claim seeking vacatur of the arbitration award would likewise be futile. Given the highly deferential standard governing judicial review of arbitration award, no additional factual allegations could transform what is, at bottom, Khan's disagreement with IC Kellett's factual finding and weighing of the evidence into a cognizable basis for vacatur. Because Kahn has not alleged facts falling within the narrow grounds for vacatur, leave to amend is denied as to this claim as well.

Accordingly, Khan is granted leave to amend the complaint in part.

## V. CONCLUSION

For the foregoing reasons, Renaissance's and the Union's motions to dismiss are GRANTED. The Union is hereby terminated from this action. Khan may file an Amended Complaint, if at all, by October 20, 2026. If Khan does not do so, the case will be closed. The Clerk of the Court is respectfully directed to terminate the motions, Docs. 21 and 24.

It is SO ORDERED.

Dated: September 29, 2026
New York, New York

EDGARDO RAMOS, U.S.D.J.